# Bates v. Commonwealth.

(Decided October 6, 1925.)

## Appeal from Knott Circuit Court.

1. Criminal Law—Continuance Properly Refused, where Affidavits Allowed as Depositions, and no Showing that Presence of Witness was Necessary.—Where court allowed affidavits for continuance to be read as depositions, and there was no showing that full effect of testimony could not be had without presence of witness it was not error to refuse a continuance.

2. Homicide—Lapse of Three Months After Finding of Bullet at Place of Shooting Affected Weight, Not Competency, of Evidence.—In prosecution for murder, a lapse of three months after finding of a bullet by owner of ground at place of shooting, who was present when deceased was found, went merely to weight, not competency, of evidence.

3. Criminal Law—Evidence Held to Show Offense was Committed in County of Place of Trial.—In prosecution for murder, testimony of witness not objected to, that deceased was killed in county, and fixing of location by other witnesses, held sufficient to show offense was committed in county of place of trial.

4. Homicide—Evidence of Hostility Between Accused and Deceased Properly Admitted.—In prosecution for murder, evidence of a statement made to witness by accused showing hostility of accused to deceased properly admitted.

5. Criminal Law—Hypothetical Question as to Distance Deceased Could have Walked After Being Shot Held Proper.—In prosecution for murder, hypothetical question to doctor, as to show far deceased could have walked, if shot as might be inferred from testimony of state, was proper, though accused and brother, who alone witnessed the homicide, testified that it occurred differently, where question of how killing occurred was for jury on all evidence.

6. Criminal Law—Evidence on Cross-Examination, Though Not Proper, Not Reversible Error where Contradicted on Re-Examination.—In prosecution for murder, testimony on cross-examination of mother of both accused and deceased that she advised deceased son to leave, as brothers were going to kill him, though improperly admitted as not relating to testimony in chief, was not prejudicial error in view of testimony on re-examination contradicting this.

7. Criminal Law—Conversation of a Witness with Brother of Accused, Though Improper, Not Reversible Under Statutes as Not Affecting Verdict.—In prosecution for murder, testimony of a witness as to conversation with brother of accused threatening life of deceased was improper, though brother was charged with conspiracy to kill where there was no evidence connecting him with homicide, but is not, under Criminal Code of Practice, section 340, reversible error, where such evidence had no effect on only issue before jury, that of shooting in self-defense.

8. Homicide—Instructions Following Indictment Held Not Prejudicial.—In trial of one of three brothers for murder, instruction following language of indictment that accused did shooting and brothers were present aiding and assisting was not prejudicial, where undisputed evidence showed one of brothers to be 16 miles away.

9. Criminal Law—Statement of Prosecutor that People Demanded Extreme Penalty was Improper, but Not Reversible Error.—In prosecution for murder, statement of prosecutor that people of county would not be satisfied with any penalty less than life or death, was improper, but since it was only an opinion, not inflating passions of jury, it was not reversible error.

R. MONROE FIELDS for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming.

Sam Bates, Henry Bates and Booten Bates were indicted in the Knott circuit court for the wilful murder of their brother, Robert Bates. It was charged in the indictment that the defendants shot and killed Robert Bates pursuant to a conspiracy between them to do so. In one paragraph it was alleged that Sam Bates did the shooting pursuant to the conspiracy and that Henry and Booten were present aiding and assisting. In another paragraph it was charged that Henry did the shooting pursuant to the conspiracy and that Sam and Booten were present aiding and assisting. Sam was placed on trial. He was found guilty of murder and his punishment fixed at confinement in the penitentiary for life. He appeals.

The facts as shown by the Commonwealth are these: Robert was the oldest son; the father had died some time before and the younger sons claimed that certain deeds which Robert held from his father were forgeries and out of this a bitter feeling had grown up. Ballard Collins testified that previous to the killing of Robert Bates he met Sam Bates in Letcher county and Sam offered to give him eight $50.00 bills to kill Robert Bates or get him out so he could do so. Collins testified that he declined to have anything to do with it. D. I. Day testified that in January, 1924, he was defending Robert Bates on a charge of hog stealing and talked with Sam Bates to learn what he knew as a witness against Robert,

and in that conversation Sam Bates said, "If Bobby had ever treated me as he did Henny he wouldn't be here being tried for hog stealing today; I would have had him out of the way or would put him out of the way." On February 2, 1924, Sam Bates was at the house of a neighbor on Carr's creek and while there Robert Bates passed down the road and his attention was called to his brother passing. The next morning early Henry and Sam Bates came down the road inquiring if anybody had passed. They went on to a neighbor's house below on the creek and while they were there they were keeping a lookout to see if anybody passed. They went in the house and the door was left open, although it was a cold morning. Robert Bates passed, and soon after this Sam Bates and Henry Bates got on their horses and went on down the creek as he had gone. The road to Hindman turned off some distance below. When they reached this road they turned towards Hindman. A farmer who lived about 200 yards from the top of the ridge saw Robert Bates pass and soon thereafter saw Henry and Sam Bates following and riding more rapidly than Robert. A few minutes after they passed over the top of the hill he heard two pistol shots and a little later some more shots. His daughter, who was going to school, testified that the first shots were fired when she was about 50 yards from the top of the hill and the others just before she reached the top of the hill. A farmer who lived about 200 yards beyond where the shooting occurred testified that he was in his house; that he heard the shots of the pistol, and after the last shots were fired he went to the door and in about the time it would take a man to come from the place of the shooting to his house Henry Bates came to his gate and called to him that two men wre fighting up there and asked him to go up and help part them. Before they started Sam Bates appeared with a pistol in his hand and offered to surrender to him and wanted him to take the pistol, which he declined to do; all of them went up to where the shooting occurred and when they got there he saw the body of Robert lying about forty-five feet from the road out in the field. He was lying on his face and apparently dead. There was a slight fall of snow on the ground. The witness saw in the snow where Robert Bates had gotten over the fence by the side of the road and had walked out to where he fell. He also saw in the same way where another person, about two panels farther up, had gotten over the fence and walked out to

within three feet of where the deceased lay and had then returned to the road a little above where he had first got over. A few panels of fence below where Robert crossed the fence there was also a sign where a person had crossed the fence and had gone out to near where the deceased was and then returned to the road. The neighbors were telephoned to and came in. They then went to the body of the deceased; he was dead. He was shot once through the breast, the ball lodging in the back. He was also shot twice through the head; the blood and brains were running out on the ground as he lay with his face downward. He had on his gloves; the finger of one glove had been hit by a bullet and the end torn. There was also sign of a bullet scraping his belt. He had on his overcoat and in the pocket of his overcoat was a pistol which had not been fired. Booten Bates lived sixteen miles away and there was no evidence showing that he was nearer than this at the time of the homicide.

The defendant, Sam Bates, denied making to Collins or Day the statements they testified to, and he showed by several witnesses that after these dates he and his brother had been seen together at different places and were friendly, or apparently so. He and Henry Bates both testified that they left home that morning together to go to Hindman to have a deed drawn; that they didn't know Robert Bates was on the road to Hindman or that he had left the Carr's creek road until they overtook him; that when they overtook him Henry passed on but Sam spoke to his brother Robert and they got to talking; that Robert asked him to take a drink with him and produced a bottle from which they drank. After this they got into a horse swap and Sam agreed to swap his mule for a horse Robert had. They got down to change saddles and when the saddle was taken off of Robert's horse Sam saw it was hipped and refused to make the trade. Robert refused to rescind and Sam then offered to write him a check for $10.00. Robert refused to take the check. Sam then put his saddle back on his mule and was about to get on the mule when Robert struck him from behind and kicked him. They then clinched and fell to the ground. After they got up from the ground Robert drew his pistol. Sam knocked it out of his hand and it fell near the fence. Both made a rush for the pistol and Sam got hold of the butt and Robert the barrel. Robert was the larger man. In the struggle over the pistol it was fired twice. By this time Robert had gotten over the

fence, which was about three feet high, and both of them were still holding to the pistol and trying to get it from the other. In this struggle the pistol again went off twice. Sam says he fired it believing that Robert would kill him. Robert then walked away from the fence and fell where he was afterwards found. Henry testified that he had ridden about a hundred yards ahead and was never nearer than this during the difficulty. Henry and Sam both testified that neither of them had a pistol. Sam testified that the pistol with which the shooting was done was marked L. C. on the butt, and that during the day he had thrown the pistol out in the weeds but told the sheriff where it was. This pistol was not produced at the trial.

On the calling of the case for trial Sam Bates filed an affidavit for continuance on the ground of the absence of Bob Neice and Elgin Neice, the former being a brother of Robert Bates' wife. The court allowed the affidavit to be read as the deposition of these witnesses and refused to continue the case. This is complained of. It is true that this was the term at which the defendants were indicted, but there was no showing that the full effect of the testimony of the two witnesses could not be had without their presence in court. Their testimony was in substance that Bob Neice had borrowed from Robert Bates a 38 Smith & Wesson pistol with the letters L. C. cut in the handle; that this was a different pistol from the one taken from his pocket after he was dead; that on the day before Robert Bates had stopped at Neice's and gotten this pistol and went away with it. When the statements of the witnesses were read as their deposition, and this was the only fact they would testify to if present, it can not be said that the substantial rights of the defendant were prejudiced by the overruling of the motion for a continuance.

The man who owned the ground where the deceased was found and who was present when his body was taken up testified that on May 12th he was repairing the fence along the road there and walked out to the place where the head of the deceased was and ran his hand down in the ground; that the ground was soft and he found the hole where a bullet had gone down and followed this hole until he found the bullet, which was about six or eight inches below the surface. The bullet was produced in evidence, to all of which the defendant objected, and his objections being overruled he excepted. The shooting occurred on February 13th. The bullet was found in the

inclosed field on May 12th, and there was no evidence that the ground had been disturbed in the meantime. The bullet is not produced here, but it is shown by the record that the pistol from which the shooting was done was a 38 Smith & Wesson pistol. The bullet when produced would show whether it was such a ball as that kind of pistol would fire. So the question presented is whether the discovery of the bullet after three months is so remote as to render the evidence inadmissible or whether the lapse of time goes simply to the weight to be given the evidence. In 16 C. J. 619 the rule is thus stated:

"The fact that a considerable length of time elapsed after the crime before the weapon was found, or that in the meantime third persons may have had access thereto, goes to the probative force but not to the admissibility of the evidence."

Among the cases cited in support of the text is Hickey v. State, 51 Tex. C. R. 232, where a bullet was found in the ground about one hundred days after the homicide. The court said:

"While it is true that this record shows that it was something like one hundred days after the homicide before the bullet was found; cattle had run over the land and other things had been done that might destroy the identity of the spot, still these circumstances would only go to the probative force of the testimony and not to its admissibility. In this record we have the state showing that the bullet was exactly the same size and caliber of appellant's pistol, and that the bullet was found in the ground under the place where deceased's head had lain. We think that this renders the testimony admissible."

To same effect see Fleshman v. Collier, 47 Ga. 253; Farmers' Bank v. Saling, 33 Ore. 394; 1 Wigmore on Evidence, section 437; 3 Chamberlayne on Evidence, section 1747.

We therefore conclude that the evidence of the finding of the bullet was properly admitted. Though there was no showing here that the bullet was of the same size and caliber as the pistol which appellant had, the size and caliber of the pistol was established by undisputed evidence, and the bullet was produced before the jury and showed for itself its caliber. There was no effort to show that the bullet was not of the same size and caliber as the pistol.

It is objected that the evidence does not show that the offense was committed in Knott county. But in the examination of Joe Reynolds, after he had stated the place where the deceased was killed, this question and answer followed; "Q. In this county? A. Yes, sir." There was no objection to the question, and in addition to this by a number of witnesses the exact location was fixed with reference to certain well known objects in the county which left no doubt as to the location of the homicide. The evidence of D. I. Day as to the statement made by appellant to him in regard to his brother Robert served to show his hostility to Robert and was properly admitted.

The hypothetical questions asked Dr. Holburn were not improper although not based on the facts as testified to by appellant and Henry Bates. None of the Commonwealth witnesses saw the homicide. How it occurred was a question for the jury on all the evidence, and it was not improper in a hypothetical question to ask the doctor how far the deceased would walk if he had been shot in a way that might reasonably be inferred from the facts shown by the Commonwealth, although the appellant and his brother, who alone saw the homicide, testified that it occurred differently.

The mother of Sam and Robert Bates was introduced as a witness for the defendant and on cross-examination by the Commonwealth was asked and allowed to answer this question over the objection of the appellant: "Q. I will ask you if you didn't advise Bobby to leave, that they were going to kill him? A. I did." This testimony did not relate to anything that she had said in chief and should not have been admitted. But it was not substantially prejudicial to appellant in view of her re-examination, which was in these words:

"Q. You never saw Sam here make any effort to hurt Bobby in any way? A. No, sir.

"Q. And you never advised him that he was in any danger from Sam here did you? A. No, sir.

"Q. At the time he got killed and for some time before that he and Bobby had been friendly with each other? A. Yes, sir.

"Q. Traveled around together sometimes? A. Yes, sir."

Ballard Collins, over the objection of the defendant, was allowed to testify as follows as to a conversation

between him and Booten Bates about three weeks before Robert Bates was killed:

> "I had been to Whitesburg and come back to Booten's store and stopped and Booten asked me did I see Bobby and I told him that I saw him and Irvine Baker standing on the street talking, and he says, 'They are fixing to kill me and Henny,' and I says, 'No, I reckon not; I didn't hear anything about that,' and Booten said, 'Have to get Bobby out of the way,' and asked how much I would take, and I told him I wouldn't do it at all, and he says, 'Well, it has to be done and is going to be done.' "

There is no evidence connecting Booten Bates in any way with the homicide. While a conspiracy is charged there is no evidence that he was a member of any conspiracy to kill his brother, and this statement of his went to show his feeling toward his brother, but was entirely incompetent against Sam Bates. Section 340 of the Criminal Code provides:

> "A judgment of conviction shall be reversed for any error of law appearing on the record when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

There was evidence on behalf of the Commonwealth to the effect that Henry and Sam Bates were looking out for Robert Bates as they went down Carr's creek, and that as soon as he passed they started on after him. They say they did not know he had turned off at the Hindman road. But the jury might well infer that the tracks of his horse would show in the newly fallen snow at the forks of the road, and the fact that when seen soon after this they were riding faster than Robert Bates, warranted an inference that their purpose was to overtake him. The fact that the shooting occurred so promptly after they overtook him lent color to the inference that they were pursuing him to attack him. He was shot so often that the jury might well infer that the person doing the shooting intended without doubt to kill him. The proof that two balls passed through his head and that a fragment of bone was found in the ground tended strongly to show that he was shot after he was lying on the ground. The case really turned on what took place there on the road when they overtook him. How Booten

felt toward his brother threw no light on this, and on the whole case we cannot see how the defendant's substantial rights were prejudiced on the trial by this error of the court. The only question before the jury under the defendant's proof was whether the shooting was in self-defense. This evidence threw no light on that question. The verdict of the jury shows they did not credit the defendant's version of the shooting. This evidence could not have affected the result.

The court in its instructions followed the language of the indictment, but there was no prejudice to the substantial rights of Sam Bates in this, for the evidence was undisputed that Booten Bates was sixteen miles away. The Commonwealth's attorney in his concluding argument to the jury said this:

"The people of Knott county will not be satisfied with any verdict less than the extreme penalty of life or death."

The defendant objected to this and moved the court to admonish the jury not to consider it. The motion was overruled. He then moved the court to discharge the jury, and this motion was overruled. The Commonwealth attorney should not have made this statement and the court should have admonished the jury not to consider it. But the attorney only stated to the jury an opinion of his own. There was nothing in it to inflame the passions of the jury. It was simply an improper appeal, and upon the whole case, in view of all the facts, the court concludes that the substantial rights of the defendant were not prejudiced by any error of law in the trial.

Judgment affirmed.